**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SALVO PARTNERS LLC; UZMA KHAN; BROWNSTONE HOUSING CORPORATION; and 158W118 LLC <br><br> Plaintiffs, <br><br> -against- <br><br> CITY OF NEW YORK, <br><br> Defendant. | Case No. _____ <br><br> CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF <br><br> JURY TRIAL DEMANDED |

Plaintiffs, through their undersigned counsel, bring this action against Defendant City of New York (the "City") seeking damages, a declaratory judgment, and injunctive relief. A jury trial is demanded as to damages, but not liability.

**PRELIMINARY STATEMENT**

1.  The City of New York systematically engages in a taking of property from thousands of New Yorkers, including Plaintiffs.

2.  Plaintiffs each own real property in the City that is located next to another property that, according to the City, poses a potential safety risk.

3.  Through its laws and rules, the City has commanded and authorized the owners of each of those neighboring, at-risk properties to construct a metal and wood structure—known as a sidewalk shed. The shed is intended to guard against the unlikely but consequential possibility that debris might fall from these at-risk properties.

4.  The City, however, has commanded and authorized the owners of each of these at-risk properties to extend the shed onto the property of Plaintiffs—each of whom is a blameless neighbor

1

who owns a property next to an at-risk property. Thus, Plaintiffs' properties are encumbered by sheds that the City required the neighboring property-owners to erect on and in contact with Plaintiffs' property. The City does not require the at-risk neighbor to pay Plaintiffs. Nor does the City compensate Plaintiffs for this intrusion. Nor does it preserve Plaintiffs' right to exclude others. Rather, the City requires another party to build something that touches each Plaintiff's building, occupies space on their land, or both. This appropriation of property has happened to thousands of New Yorkers. Moreover, in hundreds of instances, the City itself built a shed on or in contact with a blameless neighbor's property—because the City owns or rents the neighboring, at-risk property.

5.    The City prevents Plaintiffs from stopping this intrusion. Specifically, for each Plaintiff, the City engaged in a taking of property under the Fifth Amendment's Takings Clause by *requiring* the Plaintiff's neighbor to erect a shed, by *requiring* the shed to occupy a portion of each Plaintiff's property, and by *requiring* that shed to touch each Plaintiff's building. This occupation of a portion of their property is a taking. So is touching the facade of their property.

6.    Under the Takings Clause, when a government requires a private property-owner to build a structure on or in contact with another private party's property, the government (in this case, the City) must compensate the second owner for the use of its property.

7.    As illustrated by the recent photographs appearing within this paragraph, the sidewalk sheds do not remain on public sidewalks. Instead, they are situated on Plaintiffs' properties:

a. Set forth below is a photo of the property of Plaintiff Salvo Partners LLC, located at 107 W 120th Street, and the shed that its neighbor erected on Plaintiff Salvo's property:



b.  Set forth below is a photo of the property of Plaintiff Uzma Khan, located at 333 W
    18th Street, and the shed that her neighbor—a division of the City itself—erected on
    her property:



c.  Set forth below is a photo of the property of Brownstone Housing Corporation, located

at 167-169-171 W 73rd Street, and the shed that its neighbor erected on its property:

-



d. Set forth below is a photo of the property of Plaintiff 158W118 LLC, located at 158 W

118th Street, and the shed that its neighbor erected on its property:



8. None of the Plaintiffs consented to this appropriation of their properties. None of them has received compensation for the use of the front part of their property even though the City authorized a third party—or itself—to intrude onto that property. The City itself has paid various property owners, including Plaintiff Khan, for air rights along the *sides* or in the *backs* of properties in New York City, raising this obvious question: Why does the City acknowledge that *those* intrusions warrant payment, yet permit itself and other at-risk neighbors to appropriate the facades, front steps, front patios, and front air rights of thousands of properties without paying just compensation?

9. There is no valid answer: Across the five boroughs of the City, many thousands of blameless neighbors have experienced and continue to experience infringement of their property rights because of the City's laws and rules and because of sidewalk sheds. The intrusion lasts, on average, for well over a year, and many of these sheds remain in place for multiple years, partly because it is often cheaper for owners of at-risk properties to maintain sheds rather than to efficiently complete repairs that the City requires. Moreover, the City forces *blameless* neighbors to incur the burden of the shed; if the City required the at-risk neighbors to compensate them fairly—rather than simply seizing the property of blameless neighbors—the at-risk neighbors would need to internalize the costs that they and the City instead have foisted onto Plaintiffs and other innocent property owners.

10. For many reasons, sheds are loathed by the people of New York City. Recent polls show that 71% of New Yorkers consider the City's laws in desperate need of an overhaul, and 77% feel that sheds negatively affect their everyday lives. Many newspaper articles and television commentators have decried how sheds worsen the City. The sheds are unsightly. They reduce property values. They harm—or destroy—businesses. They drive away tenants, obstruct

7

entryways, impede pedestrians, jeopardize the well-being of residents with mobility impairments, block light, result in random people sleeping on the steps of blameless owners, kill plants, attract rats, and conceal and facilitate criminal activity.

11. City leaders describe the City's sheds as "out of control"—a "blight" that is "stifling small businesses." Mayor Eric Adams has emphasized that sheds are a "safe haven for criminal behavior" and have a negative economic effect: "So many businesses are impacted by having the sheds up in front of them."

12. Now, Plaintiffs' civil action seeks to end the practice of forcing blameless neighbors to incur the costs of keeping New Yorkers safe. The lawsuit does not challenge whether the City may require owners of properties that are at risk to erect sidewalk sheds in front of their own properties. Nor does this action challenge whether the City may require owners of at-risk properties to construct sheds on public land (such as publicly owned sidewalks). Nor does it challenge the prudence of the City's laws and rules relating to sidewalk sheds.

13. Rather, this action concerns a purely legal issue: Whether the City has a constitutional obligation to compensate blameless owners—like Plaintiffs—when the City requires or authorizes property owners to construct sheds on or in contact with the land or buildings of Plaintiffs and other blameless neighbors. The lawsuit seeks to establish that when the City requires a private party to encroach on a neighboring property or empowers them to do so, the City must compensate the party whose property is occupied. The same principle is true when the City itself builds a shed on a neighboring property.

14. In sum, Plaintiffs and thousands of other similarly situated New Yorkers are entitled by the Fifth Amendment to compensation for the City's past and ongoing takings, as well as other related relief.

## PARTIES

15. Salvo Partners LLC ("Plaintiff Salvo") is a limited liability company, established under the laws of New York State, that owns the property located at 107 W 120th Street in the Borough of Manhattan. Plaintiff Salvo has owned the property since October 2018.

16. Plaintiff Uzma Khan ("Plaintiff Khan") owns the property located at 333 W 18th Street in the Borough of Manhattan. She has owned the property since April 2010.

17. Plaintiff Brownstone Housing Corporation ("Plaintiff Brownstone") is a corporation located at 167-169-171 W 73rd Street in the Borough of Manhattan. Plaintiff Brownstone has owned the property since December 1986.

18. Plaintiff 158W118 LLC ("Plaintiff 158W118") is a limited liability company, established under the laws of New York State, that owns the property located at 158 W 118th Street in the Borough of Manhattan. It has owned the property since January 2024.

19. Defendant City of New York is a municipal entity organized under the laws of the State of New York. It maintains its principal office in the County of New York. The City adopted and now implements and enforces the laws and rules that result in the constitutional violations asserted in this action. Those laws and rules, including Section 3307 of the City Building Code and Section 28-302 of the City Administrative Code, require neighboring property-owners under certain circumstances to erect sheds that extend onto and/or make contact with properties owned by Plaintiffs and the members of the proposed class that Plaintiffs represent.

## JURISDICTION AND VENUE

20. This action is brought under 42 U.S.C. § 1983. Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) because this action seeks redress for

violations of each Plaintiff's rights under the United States Constitution, including under the Takings Clause and the Due Process Clause.

21. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper, including equitable relief.

22. This Court has jurisdiction to grant equitable relief under 28 U.S.C. §§ 1343(a)(3) & (4); 28 U.S.C. § 1651; and 28 U.S.C. § 1331 as well as 28 U.S.C. §§ 2201 and 2202.

23. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear Plaintiffs' claims for damages under the New York State Constitution (use of eminent domain without compensation).

24. Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims and the claims of members of the proposed class occurred in New York County and Bronx County. Each Plaintiff owns a property in Manhattan that has or had a shed in front of it because of the laws and rules of the City described in this Complaint, and more of the properties of individuals in the proposed class are located in Manhattan than in any other borough of the City.

## STATEMENT OF FACTS

### I. The Facade Inspection and Safety Program

25. There are more than 375 miles of sheds on City sidewalks within the five boroughs of the City.

26. In 1980, the City adopted Local Law 10, which required inspections of street-facing facades for certain multi-story buildings. Local Law 10 was adopted after debris fell from a building and killed a college student in Manhattan. The inspection requirement was broadened in 1998, when the City adopted Local Law 11, which required inspecting more buildings, and

10

inspecting all facades and corners—not just those that were street-facing. Through rulemakings, the City repeatedly expanded the program further in the ensuing years, adding new timelines for inspections, adding new rules for inspectors, and increasing how extensively properties must be inspected.

27. Together, the City officially refers to these laws and rules as the Facade Inspection and Safety Program ("FISP"), but New Yorkers (in general) colloquially call the program "Local Law 11." Some of the sheds in the City are erected when a building is being constructed or renovated. Others occur as part of the FISP inspection regime.

28. Under FISP, owners of buildings taller than six stories must have a City official inspect the facades of their buildings every five years. If the City inspector deems that the building is unsafe, FISP requires the owner of that building to undertake repairs. While those repairs are pending, the public sidewalk adjacent to that building must be covered by a sidewalk shed. *See* N.Y.C. Admin. Code §§ 28-302.1-.6; N.Y.C. Building Code § 3307.6.2.3; 1 R.C.N.Y. §§ 103-04.

29. Under FISP, the requirement to undertake repairs applies even if a building is currently safe but has minor problems that are projected by the City to manifest as risks at some future time. Such properties require "a repair and maintenance program" in the next five years. Under FISP, this situation is colloquially referred to as a "SWARMP" property—an acronym meaning "safe with a repair and maintenance program." During the period while repairs are underway, the sidewalk around the SWARMP property also must be covered in a sidewalk shed. *See* N.Y.C. Admin. Code §§ 28-302.4-.6; N.Y.C. Building Code § 3307.6.2.3; 1 R.C.N.Y. §§ 103-04(a)(3)(K), (c)(3)(G).

30. During the period before the repairs are completed, the City requires the owner of an at-

risk property[1] to erect a shed around any part of their building that abuts a public sidewalk. This requirement applies even if only a small part of the building is, in the City's view, unsafe or "safe with a repair and maintenance program." N.Y.C. Building Code §§ 3307.6.2-.3.

31. Sheds often remain erected for substantial time periods, particularly if the work related to repairing a facade stalls. Numerous City officials and real-estate experts have concluded that these delays are prolonged because the City insufficiently penalizes owners of at-risk properties for failing to complete repairs promptly. A substantial proportion of property-owners find that it is easier and cheaper to pay the rental-cost of the sidewalk shed plus the modest penalties imposed for delayed repairs than to complete the work promptly.

32. As a result, the average sidewalk shed in NYC has been in place for almost 17 months.

33. In February 2025, the City reported that more than 1,000 sheds had remained erected for three years or longer.

34. When Local Law 10 was first enacted in 1980, there were about 250 sidewalk sheds in the City.

35. There are now over 8,400 sidewalk sheds in New York City (a more than 30-fold increase).

36. Approximately 500 of those sheds are constructed by the City itself because the at-risk property is a municipal building.

37. Along with the thousands of sheds currently standing, thousands of other sheds that were previously constructed have since been dismantled, including many during the limitations period.

38. The City's laws and rules require the construction of thousands of new sheds each year.

---

[1] The Complaint refers to a property as being "at-risk" if it has been deemed by the City to be unsafe or SWARMP. Plaintiffs lack information, however, as to whether all properties subjected to FISP are actually at-risk. The description of these properties in the Complaint as being "at risk" is merely the acknowledgement that the City views these properties as requiring scaffolding.

39. As noted above, in addition to the sheds that are built as a result of the FISP, the City's laws and rules also require the erection of sheds due to other construction, expansions, and other repairs that occur on buildings. N.Y.C. Building Code §§ 3307.6.1-.4.

40. Regardless of the reason for a shed, City laws and rules require that the at-risk property-owner erect a shed on and/or in contact with their neighbor's property (as described further below).

41. No payment to the blameless neighbor is required.

42. The City's laws and rules constitute the most burdensome regulatory approach to sidewalk sheds in the country. City Council Member Keith Powers said in July 2023, "You don't go to Chicago or Boston or Los Angeles and see scaffolding like you do here." As a result of the City's mandates, the City has more sidewalk sheds than the entire rest of the United States combined.

43. The New York City Department of Buildings, an agency of the City, is responsible for administering and enforcing the FISP and issuing rules implementing those laws and rules.

44. The Department of Buildings approves every sidewalk shed before it is built, and a sidewalk shed may not be built without the City's prior approval. A sidewalk shed permit is generally valid for one year. If that time lapses, the at-risk owner then must request approval again from the Department for the shed to remain. All or nearly all of these authorizations or re-authorizations are for a one-year period. Thus, the City has caused, authorized, required, directed, and/or mandated each of the thousands of sheds that cause a taking of a blameless neighbor's property. In many instances, it has then re-caused, re-authorized, re-required, re-directed, and/or re-mandated the maintenance of sheds that were previously erected.

## II. The City Directs That Sidewalk Sheds Enter Neighboring Property.

45. The City's laws and rules require sheds to intrude upon neighbors' property rights. That is because owners of at-risk buildings must build the sheds not only on their own property, but also

on adjacent properties.

46. Section 3307.6.3 of the City Building Code provides that sheds must be constructed in front of parts (or sometimes all) of the neighboring buildings on either side of an at-risk building.

47. When an at-risk building facade is more than 100 feet tall, a shed must extend the full length of that building plus an additional twenty feet on each side of the facade. Consequently, the shed required to be constructed by the owner of the at-risk property must extend twenty feet in front of neighboring properties on each side of the at-risk building's facade. *See* N.Y.C. Building Code § 3307.6.3.1.

48. In the case of building facades that are less than or equal to 100 feet tall, the shed is required to extend five feet in front of all adjacent buildings on each side of the at-risk building's facade. *See* N.Y.C. Building Code § 3307.6.3.2.

49. However, "sidewalk" sheds do not remain wholly on the sidewalks in front of neighboring buildings. Rather, they touch or cross onto neighboring properties as described over the next several paragraphs.

50. To begin with, the City Building Code requires sheds erected by owners of at-risk properties to physically touch buildings adjacent to the at-risk property. Section 3307.6.4.5 of the City Building Code provides that the "deck of the sidewalk shed ***shall be brought tight*** to the face of any abutting building, structure, or fence." (Emphasis added.) Section 3307.6.3 of the Code then reinforces that gaps are impermissible: "Where it is not possible to bring the deck ***tightly against the face*** of an abutting building, structure, or fence, the deck shall be brought to within 1 inch (25 mm) of the face of such building, structure, or fence, with the resulting gap ***sealed or covered*** by materials of sufficient manner and strength capable of trapping falling debris." (Emphasis added.) In other words, the shed constructed by the owner of an at-risk property must *touch* neighboring

properties, and if it cannot, that gap must be filled so that the shed of the at-risk neighbor makes contact with the property of the blameless neighbor.

51. This approach increases the harm to blameless property owners because water and debris are more likely to remain in sustained contact with the facades of each blameless neighbor's property.

52. The New York City Administrative Board issues rulings imposing civil penalties on parties who put up sidewalk sheds without touching the facade of the blameless neighbor's building. Thus, the City both requires that at-risk private parties touch the property of blameless neighbors and imposes penalties when this rule is not followed.

53. Section 3307.6.2 of the City Building Code also directs that in addition to covering "public sidewalks that abut the property," a "sidewalk shed shall be installed and maintained to protect all sidewalks, walkways, and pathways *within the property line* of a site." (Emphasis added.)

54. Thus, the City Building Code also commands that sidewalk sheds must cross onto private property when needed to bring the decking of the shed up to the neighbor's building.

55. For example, when a blameless neighbor's building is set back from the public sidewalk, the City requires the "sidewalk" shed constructed by an at-risk owner to occupy a substantial part of the blameless owner's land and/or air space.

56. These "crossovers" (*i.e.*, when a shed crosses onto a safe, neighboring property) typically happen in one—or both—of two ways.

57. First, the at-risk property's "sidewalk" shed often is structurally supported by a metal post that rests on stairs, a stoop, a patio, a lawn, or another part of the property owned by the blameless neighbor. In such instances, a blameless property-owner's land and/or building is being used,

without the owner's consent, based on the mandate of the City, to advance the City's legislative priorities.

58. Second, the at-risk property's shed often intrudes into air space that is part of the neighboring property. For instance, a shed might loom above a blameless property's front steps or patio—blocking the property's windows, obscuring its architecture, enabling criminals to look into or break into second-floor living areas, darkening the entryway, creating tripping hazards, and (among other negative effects) providing a shelter that results in non-residents, vermin, and pigeons congregating on the property.

59. Regardless of whether a neighbor's shed causes one or both types of crossover, the City is requiring blameless property-owners to suffer an invasion of their property rights: the City mandates that the at-risk neighbor place a shed inside the blameless property-owner's property lines. The City imposes these same requirements regardless of whether a building is being built anew or being renovated.

60. In all of the above instances, the at-risk neighbor's shed invades the property owned by the blameless neighbor.

61. Although some properties do not have neighbors, the vast majority of sidewalk sheds extend in front of at least one neighbor's property—and often two neighbors' properties (*e.g.*, one on each side of the at-risk building). Some sheds that extend twenty feet in each direction even intrude onto the property of two neighbors on each side (or two neighbors on one side) of the at-risk property.

62. As a result, during the applicable limitations period, thousands of sidewalk sheds were required by the City to touch and/or cross onto neighbors' properties.

63. The property rights of thousands of businesses and residents in NYC in buildings without any structural issues are infringed on (often for years at a time) by sheds mandated by the City. The City also caused, authorized, required, directed, and/or mandated the erection of these sheds on and in contact with the property of blameless neighbors.

64. The City does not require the at-risk property owners to pay the blameless neighbors or to obtain their consent. Earlier in its history, the City allowed property owners to deny their neighbors permission to construct a shed—thus, in the past, the City acknowledged that blameless neighbors had a right to exclude. Yet the City's current laws and rules deny owners this bedrock constitutional right.

65. Nor does the City itself compensate blameless neighbors for either of these two types of appropriation of their property rights, even though it is the City that has caused, authorized, required, directed, and/or mandated at-risk owners to build sheds that occupy the property of the blameless property-owners. Yet the City's practices—such as paying Plaintiff Khan for air rights on the side and rear of her property—reveal that the City grasps that air rights and facades have value. Yet the City's laws and rules require at-risk owners to appropriate property rights from the front of thousands of properties owned by blameless neighbors.

66. The City does not even require at-risk owners to provide notice to their neighbors before erecting a shed that touches the blameless neighbors' buildings, sits on their land or other property, and/or occupies the air space of their property. Nor does the City entitle blameless neighbors to a hearing or other due process before causing, authorizing, requiring, directing, and/or mandating a taking of the blameless neighbor's property.

67. The City does not require a blameless neighbor to provide its consent in order for a shed to be erected on or touch its property.

68. Each Plaintiff in this action has been injured because the City has forced the owner of a property adjacent to Plaintiff's property to erect a sidewalk shed, and required that shed to touch Plaintiff's property and/or cross onto Plaintiff's property. The City itself has appropriated these rights in many hundreds of instances, which lowers the City's property-acquisition costs and protects it from liability—at the expense of blameless neighbors. Each Plaintiff has had property taken by the City—either directly, or through compulsion and/or authorization—without compensation.

**III. The City's Laws and Rules Cause Harm to Blameless People and Businesses Across New York.**

69. The City's laws and rules are hugely lucrative to a handful of companies that specialize in erecting sidewalk sheds and other scaffolding. One study found that sidewalk-shed companies in New York City earned the same revenue in the first six weeks of 2019 as the combined revenue of every other sidewalk-shed company in the country for all of 2019.

70. While these companies might like the City's laws and rules about sheds, there is widespread agreement among other stakeholders that sheds as they currently exist in New York City are a blight on residents, property-owners, businesses, and pedestrians. Because of this near-universal disdain, the oppressive nature of sheds has wound its way into cultural commentary, including scores of articles about sheds, an episode of an HBO television show; an Instagram account that posts photos of intrusive sheds; and satire like the following cartoon from *The New Yorker*:



*"It's going on three years now since Harry has been covered in scaffolding."*

71. Leading City officials have admitted that sheds are highly undesirable and harmful to parties who are forced to have a shed on their property. In 2023, Mayor Eric Adams admitted that sheds have multiple adverse consequences: "We hear it over and over again and we must regain control of our city streets. But if we're honest about it, when we did an analysis, we realized that city rules are incentivizing property-owners to leave sheds up and put off critical work. Most sheds stay up for longer than a year, and some have darkened our streets for more than a decade. We have normalized the sheds all over our city and that is unacceptable."

72. Mayor Eric Adams also described sheds as "a safe haven for criminal behavior," as "unsightly," and as "resilient as the rats in New York." He has also admitted that the sheds cause economic harm: "So many businesses are impacted by having the sheds up in front of them."

73. Numerous other City agencies and officials have admitted that sheds cause harm to the party forced to endure a shed erected by an at-risk neighbor:

    a. Jimmy Oddo, the City's Commissioner of the Department of Buildings—which enforces FISP (the inspection program) and the City's Building Code—has admitted that sheds are a "gloomy pipe and plywood" structure that creates a "tangible negative

impact affecting the whole block." He further admitted that the law is needlessly overbroad and that too many buildings are ensnared in the City's regulatory scheme: "that's not to say every five years for every building of every age, of every material is correct."

b. Thomas Foley, the City's Commissioner of Design and Construction, has admitted that businesses "suffer behind sidewalk sheds" and characterized the proliferation of sheds as "an issue that has plagued New Yorkers for decades."

c. Manhattan Borough President Mark Levine has described the sheds as a "blight on our neighborhoods," and said the sheds have a "negative impact on communities," and "harm[ ] the businesses underneath the sheds." He further acknowledged that they are "bad for public safety," "bad for quality of life," and "ugly."

d. City Council Member Keith Powers likewise acknowledged that sheds hurt property-owners: "for the residents there who are dealt this hand of having to live under scaffolding for sometimes years, it means less pedestrians and less people walking into that business." He has described the sheds as "out-of-control".

e. City Council Member Gale Brewer expressed a similar view: "there are so many ways in which scaffolding plays a role that is not positive." She also acknowledged when a shed is erected, "the businesses that are under it, of course, are going to suffer."

f. City Council Member Ben Kallos similarly stated: "It's time to change the city landscape by removing the swarm of sidewalk sheds that blight our neighborhoods."

g. City Council Member Erik Bottcher described sidewalk sheds as "obstructing pedestrian access, stifling small businesses, exacerbating public safety issues, and diminishing the beauty of our urban landscape."

h.  The New York City Independent Budget Office has admitted that sidewalk sheds "block light, narrow the sidewalk, obscure business signs, and collect garbage and grime."

74. The conclusion of so many City agencies and officials that sheds cause real harm is backed by their own data. The City released a report in 2024 (jointly prepared with MasterCard) concluding that sidewalk sheds typically cost Manhattan businesses between $3,900 and $9,500 each month in business from MasterCard holders. As Mayor Eric Adams explained: "These sheds can cost businesses nearly $10,000 per month, *and that's just from spending by people using Mastercards.*" (Emphasis added.) In other words, the total losses to business are substantially greater.

75. The report also showed that restaurants and bars were the most impacted, with a 3.5 percent to 9.7 percent decrease in weekly transactions in the six months following the erection of new sheds.

76. The total amount of damages can be devastating. One restaurant in Times Square lost $500,000 per year after a neighbor erected a shed in front of its storefront. A New York Hospitality Alliance study found that one-third of surveyed restaurants in the City lost 50 percent or more of revenue when shrouded by a sidewalk shed.

77. Community leaders agree that the sheds are deeply harmful. For example, the President of the Flatiron NoMad Partnership said sidewalk sheds are a "blight" and "disastrous for businesses."

78. Urban advocacy organizations such as the Citizens Union and the Center for Building in North America concur, condemning the sheds for having "damaged urban life" and creating "a safety risk themselves."

79. There are other harms. According to one study, there were 52 accidents in New York City involving sidewalk sheds and other scaffolding that resulted in injury or death or the collapse of the shed or other scaffolding in the five-year period ending in May 2023. For example, a major accident occurred in November 2024 when a shed in downtown Manhattan collapsed, hurting three people, one of whom suffered critical injuries.

80. As the above paragraphs reflect, there is a broad consensus that the sheds (despite being motivated decades ago by the public purpose of providing some level of safety to pedestrians) cause both substantial economic harm to the neighbors whose property rights have been taken and cause other serious harms.

**IV. The Plaintiffs**

**Plaintiff Salvo**

81. Plaintiff Salvo has owned the property located at 107 W 120th Street in Manhattan since October 2018. The sole owner of Plaintiff Salvo lives in the building located on that property.

82. In August 2019, less than a year after Plaintiff Salvo acquired the property, the neighbor immediately to the east of Plaintiff Salvo's property erected a sidewalk shed and other scaffolding, which included a shed on Plaintiff Salvo's property.

83. Portions of the sidewalk shed have continuously been situated on Plaintiff Salvo's property for more than five years. A portion of the shed was rebuilt about two years ago.

84. The shed harms Plaintiff Salvo every day and has done so every day by using Plaintiff Salvo's property every day since it was erected.

85. On information and belief, the City issued a permit to authorize the sidewalk shed on Plaintiff Salvo's property in 2019, and then issued a permit to reauthorize the shed on Plaintiff

Salvo's property again each year after that, including in or around June 2022, June 2023, and as recently as approximately June 7, 2024.

86. The neighbor's "sidewalk" shed extends beyond the sidewalk on to Plaintiff Salvo's property.

87. The neighbor's shed touches Plaintiff Salvo's property.

88. The neighbor's shed crosses onto Plaintiff Salvo's property, in both ways that a crossover can occur. First, the neighbor's shed uses Plaintiff Salvo's steps and patio to provide structural support for the shed. Second, the neighbor's shed occupies the air space of Plaintiff Salvo's property.

89. The following photograph depicts the property owned by Plaintiff Salvo before the sidewalk shed was constructed:



90. The following three photographs depict the same property as of December 2024, with the "sidewalk" shed:







91. Plaintiff Salvo has not received any compensation from the owner of the neighboring property or from the City.

92. Plaintiff Salvo has not consented to having this shed on its property. The shed was placed on the property by agents of Plaintiff Salvo's neighbor, without advance warning to Plaintiff Salvo and without providing Plaintiff Salvo any sort of hearing or other opportunity to be heard.

93. Plaintiff Salvo's owner has complained about the shed to the neighboring property's management company. The shed, however, was not removed. Plaintiff Salvo's owner also tried to contact the City. When Plaintiff Salvo's owner called the City's Building Department to complain, no one answered the phone, and there was no way to leave a message. Plaintiff Salvo's owner will testify that he has felt powerless to stop the invasion of his property rights.

94. Among the elements of damage caused by the shed to Plaintiff Salvo are:

   a. The shed has caused physical damage to Plaintiff Salvo's property, including water damage to some of the brick and stone at the front of the building.

   b. The metal columns and other scaffolding damaged and discolored the front steps and other parts of Plaintiff Salvo's building.

   c. People congregate under the shed, including some who sleep on the property's stoop (which did not occur before the shed was erected) and others who create substantial amounts of noise on the property and leave trash on the property (which did not occur before the shed was erected).

   d. A mugging occurred underneath the shed, which shielded the criminal or criminals from view. Installing a security camera as a safety measure would be futile, because the shed would block the camera's view.

   e. The shed blocks light from entering the units of Plaintiff Salvo's property.

   f. The shed has caused other injuries to be established by the evidence.

95. The unsightliness of the shed inhibits the ability to utilize the property as a home or to entertain guests.

96. The desirability of the property to renters is diminished, thereby reducing the rent and/or increasing the number of vacancies.

97. The City required that the neighbor of Plaintiff Salvo construct the shed as a crossover (inside Plaintiff Salvo's property boundary).

98. The City also required the neighbor's shed to contact the facade of Plaintiff Salvo's property.

99. The facade of Plaintiff Salvo's property does not, under FISP, require inspection or any repairs. Moreover, on information and belief, the facade of Plaintiff Salvo's property is in good structural condition. There would not be a shed in front of Plaintiff Salvo's property except for the City's laws and rules.

100. Plaintiff Salvo seeks just compensation from the City for the taking of Plaintiff Salvo's property required by the City's laws and rules, which caused, authorized, required, directed, and/or mandated that the shed touch and cross onto Plaintiff Salvo's property.

101. Plaintiff Salvo seeks a declaratory judgment that it is entitled to future compensation if the shed remains touching and crossing onto its property.

**Plaintiff Uzma Khan**

102. Plaintiff Khan owns and resides in the property located at 333 W 18th Street in Manhattan. She resides there with her husband and their child. Plaintiff Khan became the owner of the property in April 2010.

103. In or around June 2021, the City, which owns and operates the public school immediately to the west of 333 W 18th Street, erected a shed and other scaffolding, which included a sidewalk shed at the front of Plaintiff Khan's property. At some later point, the City constructed additional scaffolding on the side and rear of Plaintiff Khan's home. The City paid Plaintiff Khan for the air rights for using the side and rear of her home. The City, however, has never paid Plaintiff Khan for using the space in front of Plaintiff Khan's home or requiring the shed to touch her facade.

29

104.  On information and belief, the City issued a permit to authorize this sidewalk shed at the front of Plaintiff Khan's property in or around June 21, 2021, and then issued multiple permits to reauthorize the shed, including as recently as approximately January 27, 2025. City laws and rules mandated that the shed be erected on Plaintiff Khan's property and in contact with her property.

105.  The shed was removed on approximately February 20, 2025, after Plaintiff Khan had engaged counsel, and just a few weeks before the filing of this Complaint. During the time that the shed was in front of Plaintiff Khan's property, it harmed Plaintiff Khan every day by using her property without her consent.

106.  That "sidewalk" shed extended beyond the sidewalk on to the front of Plaintiff Khan's property.

107.  That shed, as required by the City, touched Plaintiff Khan's property.

108.  That neighbor's shed crossed onto Plaintiff Khan's property, occupying the air space of Plaintiff Khan's property.

109.  The following photograph depicts Plaintiff Khan's property without a sidewalk shed:



110.   The following photographs depict the same property during the period when the sidewalk shed was on her property:







111.  As noted, Plaintiff Khan received some compensation from the City for the use of the side and rear of her house—and based on the fact that the property damaged her roof and dropped debris in her backyard. Plaintiff Khan has received no compensation, however, for the shed in the front of her house.

112.  Plaintiff Khan did not consent to having this shed in the front of her property. It was placed on the property by agents of her neighbor (a division of the City), without advance warning to Plaintiff Khan and without providing Plaintiff Khan with any sort of hearing or other opportunity to be heard. On numerous occasions, employees of the City misrepresented how long the shed would remain on her property. Plaintiff Khan repeatedly asked both school safety personnel and the School Construction Authority (SCA) to keep students from congregating under the shed, but students continued to congregate under the shed. Plaintiff Khan made numerous other complaints to school officials at other times, but the shed's removal was not accelerated.

113.  Plaintiff Khan expressed her frustration about the sidewalk shed to parties linked to her next door (at-risk) neighbor. The complaints did not cause the neighbor to speed up work or to remove the shed. Placing the shed in the front of her property without paying for the right to do so lowered the costs of the project for the City.

114.  Among the other elements of damage caused by the shed:

    a.  The shed damaged and discolored the front of Plaintiff Khan's building.

    b.  The shed blocked light from entering Plaintiff Khan's property.

    c.  Unhoused people slept in front of Plaintiff Khan's property because it was covered by the shed, routinely forcing members of her household to step over a sleeping person to exit the property.

    d.  Various random people would use the shed to exercise (*e.g.*, perform pull-ups) on the shed, which impaired Plaintiff Khan and her family from exiting her property.

    e.  Because of the shed, people congregated in the nook formed by the scaffold (between the at-risk school and Plaintiff Khan's home) and regularly vaped and/or smoked marijuana, which both caused putrid fumes to infiltrate the bedroom of

Plaintiff Khan's young, asthmatic daughter and forced Plaintiff Khan to run air purifiers for substantial periods of time to reduce the odors.

f.   The shed was unsightly.

g.   The shed's ugliness inhibited Plaintiff Khan's ability to utilize the property as a home or to entertain guests.

h.   Plaintiff Khan lost rental income because of the shed.

i.   The cost of obtaining insurance has risen since the shed was erected (above the standard rate of increase), and an insurance policy was canceled because of the shed.

j.   The shed caused other injuries to be established by the evidence.

115.   The City constructed this shed as a crossover (inside Plaintiff Khan's property boundary).

116.   The City also required that its shed contact the facade of Plaintiff Khan's property.

117.   The facade of Plaintiff Khan's property does not and did not, under FISP, require inspection or any repairs. Moreover, on information and belief, the facade of Plaintiff Khan's property is and was in good structural condition. There would not have been a shed in front of Plaintiff Khan's property except for the City's laws and rules.

118.   Plaintiff Khan seeks just compensation from the City for the taking of her property required by the City's laws and rules, which caused, authorized, required, directed, and/or mandated that the shed touch and cross onto the front of Plaintiff Khan's property.

119.   Plaintiff Khan seeks a declaratory judgment that she is entitled to future compensation if the shed is re-erected in the future in a manner that causes it to touch and/or cross onto her property.

**Plaintiff Brownstone**

120. Plaintiff Brownstone owns the property located at 167-169-171 W 73rd Street in Manhattan and has done so at all times relevant to this action. It acquired the property in December 1986. It is a "co-op," and most or all of the owners of Plaintiff Brownstone reside in the building located on that property.

121. In or around September 2023, the neighbor immediately to the west of Plaintiff Brownstone's property erected a sidewalk shed and other scaffolding, which included a shed on Plaintiff Brownstone's property.

122. Portions of the sidewalk shed have continuously been situated on Plaintiff Brownstone's property since that time. The permit for the shed, on information and belief, was extended on or around October 15, 2024.

123. The shed harms Plaintiff Brownstone and its residents every day and has done so every day by using Plaintiff Brownstone's property every day since it was erected.

124. The neighbor's "sidewalk" shed extends beyond the sidewalk on to Plaintiff Brownstone's property.

125. City laws and rules require the neighbor's shed to touch Plaintiff Brownstone's property.

126. The neighbor's shed crosses onto Plaintiff Brownstone's property, in both ways that a crossover can occur. First, the neighbor's shed uses Plaintiff Brownstone's steps and patio to provide structural support for the shed. Second, the neighbor's shed occupies the air space of Plaintiff Brownstone's property.

127.  The following photograph depicts the property owned by Plaintiff Brownstone before the sidewalk shed was constructed:



128.  The following three photographs depict the same property after the sidewalk shed was constructed:







129. Plaintiff Brownstone has not received any compensation from the owner of the neighboring property or from the City.

130. Plaintiff Brownstone has not consented to having this shed on its property. It was placed on the property by agents of Plaintiff Brownstone's neighbor, without advance warning to Plaintiff Brownstone and without providing Plaintiff Brownstone any sort of hearing or other opportunity to be heard.

131. Among the elements of damage caused by the shed to Plaintiff Brownstone are:

   a. The shed has caused physical damage to Plaintiff Brownstone's property, including water damage or other erosion to the facade of the building.

   b. In erecting the shed, the neighbor of Plaintiff Brownstone drilled into the wall of the property owned by Plaintiff Brownstone in order to comply with City laws and rules.

   c. The shed blocks light from entering some of the units of Plaintiff Brownstone.

   d. The metal columns have likely damaged the patio.

   e. Workers walk around on the shed outside some of the units of the property owned by Plaintiff Brownstone, using the air space of Plaintiff Brownstone's property and creating a sense of invasion of privacy among some of the occupants of the property owned by Plaintiff Brownstone.

   f. There was an attempted break-in and the shed provided cover to the would-be burglar.

   g. To prevent further break-in attempts, "J bars" were installed at Plaintiff Brownstone's property, which made the building less attractive.

   h. The resident of Unit 1 of the property owned by Plaintiff Brownstone uses that property significantly less often as a result of the shed and has been less productive and profitable in her home-office work.

    i.   Numerous plants that previously flourished at the property owned by Plaintiff Brownstone have been killed as a result of the shed.

    j.   The shed has been a source of stress and conflict among residents of Plaintiff Brownstone.

    k.   The shed has impaired the plans of a resident of Plaintiff Brownstone to sell her unit.

    l.   The shed has lowered the value of the ownership units of Plaintiff Brownstone.

    m.   The shed has caused other injuries to be established by the evidence.

132.  The unsightliness of the shed inhibits the ability to utilize the property as a home or to entertain guests.

133.  The City required that the neighbor of Plaintiff Brownstone construct the shed as a crossover (inside Plaintiff Brownstone's property boundary).

134.  The City also required the neighbor's shed to contact the facade of Plaintiff Brownstone's property.

135.  The facade of Plaintiff Brownstone's property does not, under FISP, require inspection or any repairs. Moreover, on information and belief, the facade of Plaintiff Brownstone's property is in good structural condition. There would not be a shed in front of Plaintiff Brownstone's property except for the City's laws and rules.

136.  Plaintiff Brownstone seeks just compensation from the City for the taking of Plaintiff Brownstone's property required by the City's laws and rules, which caused, authorized, required, directed, and/or mandated that the shed touch and cross onto Plaintiff Brownstone's property.

137. Plaintiff Brownstone seeks a declaratory judgment that it is entitled to future compensation if the shed remains touching and crossing its property.

**Plaintiff 158W118**

138.  Plaintiff 158W118 owns the property located at 158 W 118th Street. It acquired the property in January 2024.

139.  The neighbor immediately to the east of Plaintiff 158W118's property erected a sidewalk shed and other scaffolding, which included a sidewalk shed in front of Plaintiff 158W118's property. This shed was erected in November 2024. The shed is still there. It harms Plaintiff 158W118 every day and has done so every day—and has used Plaintiff 158W118's property every day—since it was erected.

140.  On information and belief, the City issued a permit to authorize the neighbor to erect the sidewalk shed on Plaintiff 158W118's property in 2024.

141.  The shed was erected while the owners of Plaintiff 158W118 were traveling overseas. Their home-security camera indicated that someone was on their property. One of the owners of Plaintiff 158W118 watched through the security camera, from overseas, as the shed was constructed on the property.

142.  Plaintiff 158W118 did not consent to the shed being constructed on its property. Plaintiff 158W118 did not receive advance notice that the shed would be constructed on the property. One owner of Plaintiff 158W118 directed the construction crew to stop and demanded to speak with the management company. The management company, however, responded that the City required the owner to put this shed up and that the owner had "no choice." Construction of the shed continued, over the express objection of Plaintiff 158W118's co-owner.

143.  The City has required the neighbor to place the "sidewalk" shed in front of Plaintiff 158W118's property and in contact with the facade of Plaintiff 158W118's property. It does not stay on the sidewalk.

144.  The shed crossed onto Plaintiff 158W118's property, occupying the air space of Plaintiff 158W118's property. A structural post of the shed is also standing on, contacting, and making use of the ground of Plaintiff 158W118's property.

145.  Plaintiff 158W118 has not received any compensation from the owner of the neighboring property or from the City.

146.  Plaintiff 158W118 has never consented to having this shed on its property.

147.  One of Plaintiff 158W118's co-owners called the City's Building Department to complain, but no one answered, and there was no way to leave a message.

148.  One of Plaintiff 158W118's co-owners complained to the management company used by the at-risk property, expressing (among other concerns) a fear that the shed might lead to a home invasion. Nothing was done by the management company to prevent this risk.

149.  Among the elements of damage the shed has caused Plaintiff 158W118 are:

a.  The shed has caused water damage and ice damage to Plaintiff 158W118's property, including damage to the facade and front steps.

b.  The shed blocks light from entering the property.

c.  People congregate under the shed and sleep on the stoop (which did not occur before the shed was erected), which reduces the value of the property and how much value the owners of Plaintiff 158W118 derive from the property.

d.  The shed increases Plaintiff 158W118's risk of being subject to liability.

e.  The shed creates a risk that the metal columns and other scaffolding will damage and discolor the property.

f.  The shed creates a risk that the shed will damage the property significantly if it collapses.

g.  The shed increases the risk of a break-in on the second floor and has caused serious anxiety for the owners of Plaintiff 158W118.

h.  The shed makes the property less visually appealing.

i.  The shed has caused other injuries to be established by the evidence.

150.  The following photograph depicts Plaintiff 158W118's property before the shed was constructed:



151. The following three photographs from December 2024 depict Plaintiff 158W118's property now, after the shed was erected:







152. The City required that the neighbor of Plaintiff 158W118 construct the shed as a crossover (inside Plaintiff 158W118's property boundary).

153. The City also required that the neighbor's shed contact the facade of Plaintiff 158W118's property.

154. The facade of Plaintiff 158W118's property does not, under FISP, require inspection or any repairs. Moreover, on information and belief, the facade of Plaintiff 158W118's property is in

good structural condition. There would not be a shed in front of Plaintiff 158W118's property except for City laws and requirements.

155. Plaintiff 158W118 seeks just compensation from the City for the taking of its property required by its laws and rules, which caused, authorized, required, directed, and/or mandated that the shed touch and cross onto Plaintiff 158W118's property.

156. The shed was placed on the property by 158W118's neighbor, without advance warning to Plaintiff 158W118 and without providing Plaintiff 158W118 any sort of hearing or other opportunity to be heard.

157. Plaintiff 158W118 seeks a declaratory judgment that it is entitled to future compensation if the shed remains touching and crossing its property.

## CLASS ACTION ALLEGATIONS

158. Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and, if needed, 23(c)(4) or other relevant provisions of Rule 23.

159. The proposed class is composed of all individuals or entities who currently own or previously owned a property within the City that is or was (during the time of ownership) touched by and/or subject to a crossover by a sidewalk shed that the City's laws or rules caused, mandated, authorized, required, and/or directed any owner, owners, or long-term renter of a neighboring property to construct.

160. In some instances, the City itself is the owner or long-term renter of a neighboring property that constructed a shed or touched or caused a crossover onto one or more blameless neighbors' properties.

161.  Plaintiffs ask the Court to create subclasses (if needed) to effectuate the purpose of Rule 23 and the interests of class members.

162.  This action satisfies the four requirements of Rule 23(a).

a. **Numerosity**: Joinder of all class members is impracticable because of the size of the class (many thousands of members). There are over 8,400 sheds in the City. Accordingly, there are thousands of property-owners in the City of New York who currently have or previously (but within the limitations period) had a shed that was required to contact their property and to crossover into their property line because a neighbor placed it there due to the mandates of the City. All of these property owners would be members of the class.

b. **Commonality**: There are questions of law and fact common to all members of the class, including but not limited to:

- whether the City violates the Fifth Amendment's Takings Clause when it requires one property-owner to place a shed or other scaffolding inside the property owner's property line or in contact with the building on that property, or both, without compensation; and

- whether failing to provide advance notice to property-owners that their property will be occupied, and failing to provide an opportunity to be heard related to the construction of such sheds, is a violation of the Due Process Clause.

c. **Typicality**: The claims of Plaintiffs are typical of those of the class. Each named Plaintiff has been harmed by the City's laws and rules requiring owners of at-risk properties to erect sheds that touch neighboring buildings and/or crossover into neighboring property lines without paying compensation to or obtaining permission from the infringed-upon property-owners; and requiring

property-owners to permit their land to be touched and subject to a crossover without notice or an opportunity to be heard.

d. **Adequacy of Representation**: Plaintiffs and class counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests in this matter that are antagonistic to other class members. Counsel is experienced in federal civil rights litigation and in class action litigation, including litigation related to the Takings Clause, and have the necessary resources to pursue this litigation.

163.  Prosecuting thousands of separate actions would be unduly burdensome and could lead to inconsistent results.

164.  Questions of fact predominate because each member of the proposed class owns or owned property in the City; had a neighbor place a shed inside their property line and/or in contact with their owned building; and experienced this invasion of their property rights because of the City's laws and rules.

165.  The identity of class members is readily ascertainable because the City maintains records of the locations of all current sidewalk sheds as well as where sidewalk sheds previously were located. Public records show which buildings are adjacent to those properties and when a given sidewalk shed was erected. This will enable the identification of all class members who own or owned properties impacted by the sheds.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Takings Claim Under Fifth Amendment

(All Plaintiffs against the City)

166.  Plaintiffs hereby re-allege and incorporate the preceding paragraphs by reference.

167.  Plaintiffs and members of the proposed class, as owners, have a property interest in their property, in the portion of their owned property that was touched or subject to a crossover, and in the right to exclude others from their property.

168.  The City has a policy and practice of violating the Fifth Amendment rights of property-owners against having their property appropriated. This policy and practice violates 42 U.S.C. § 1983. Plaintiffs, like members of the proposed class, were harmed by this policy and practice.

169.  There are two discrete takings, each of which gives rise to liability under the Fifth Amendment.

170.  First, the City has a policy and practice of violating Plaintiffs' rights under the Fifth Amendment's Takings Clause (as incorporated against the States by the Fourteenth Amendment) by requiring property-owners to place sheds in contact with their neighbor's real property. This is a "touching," which was held to be a taking under *Loretto* and other cases.

171.  Second, in many instances—and for each of the named Plaintiffs—the City has a policy and practice of requiring at-risk property-owners to construct sheds that cross their neighbor's property line.

172.  Each named Plaintiff experienced both types of takings. These takings are continuing wrongs that occur anew every day that the at-risk neighbor's shed touches or crosses onto the property of Plaintiffs and members of the proposed class.

173.  By adopting and implementing a policy and practice of requiring at-risk property-owners to place sheds in contact with the buildings of blameless neighbors and to cross over the property lines of blameless neighbors, the City has engaged in a physical taking of the property of Plaintiffs and members of the proposed class. This action by the City was conducted under color of state

law. The City's actions have denied Plaintiffs and a class of similarly-situated people their right under the Takings Clause to receive just compensation if their property is taken for public use.

174.  In the alternative, the City's laws and rules create a scheme that results in a regulatory taking that violates the Fifth Amendment rights of Plaintiffs and members of the proposed class.

175.  Government action occurred because the government obligated Plaintiffs' neighbors (and the neighbors of class members) to construct sheds that (1) touch and/or touched buildings of another private party and/or (2) crossed into and/or crossed over the neighboring property lot. Decades of settled case law including *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982), require holding a government liable when it causes, authorizes, requires, directs, and/or mandates a taking—whether or not it takes property for itself. Moreover, when a government directs that a private party give up its property or directs another private party to take it, a taking occurs. *E.g.*, *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 240 (2003); *Horne v. Dep't of Agriculture*, 576 U.S. 351, 365-66 (2015); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021).

176.  That is what has occurred here: The City required at-risk neighbors (including itself in many instances) to appropriate various property rights possessed by Plaintiffs and members of the proposed class. Without Plaintiffs' consent, and without paying compensation to Plaintiffs, and without giving Plaintiffs any choice about whether sheds were erected on their property, the City required that sheds be erected on Plaintiffs' properties and in contact with their buildings.

177.  In many cases, there also was government action because the City is the owner of the at-risk property, and so the City itself constructed sheds that (1) touch and/or touched buildings of a private party and/or (2) crossed into and/or crossed over the neighboring property lot.

178.  The City's policy and practice (regardless of whether the City (i) appropriates property for itself or (ii) requires and/or authorizes a third party to do so) violates both the Takings Clause of the U.S. Constitution (as incorporated against the States) and 42 U.S.C. § 1983.

179.  The City's laws and rules relating to inspections and sheds—including the FISP and the City Building Code—seek to advance the public purpose of protecting people and property. But they do so without paying constitutionally mandated compensation to affected property-owners.

180.  These requirements, enacted and promulgated through the FISP, laws in the City Administrative and Building Code, and the Rules of the City of New York, among other provisions of City law, are a policy and/or practice for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

181.  Every year (or at other intermittent intervals), the City engages in the separate act of issuing a new permit for a shed to be built or remain on each Plaintiff's property. Each authorization to erect or maintain a shed is a new, independent taking for that period of time (or any portion thereof). In the alternative, the fact that the shed persists in the same location is an ongoing violation of the rights of Plaintiffs and the members of the putative class, giving rise to a continuing violation.

## SECOND CAUSE OF ACTION

*The Takings Clause of the Fifth Amendment, as Incorporated Against the States Under the Fourteenth Amendment*

(All Plaintiffs against the City)

182.  Plaintiffs hereby re-allege and incorporate the preceding paragraphs by reference.

183.  Even if 42 U.S.C. § 1983 did not exist, Plaintiffs have a "built-in" cause of action under the Takings Clause to seek just compensation for a taking.

55

184.    Therefore, for the reasons specified above, including in particular the allegations in the First Claim for Relief, Plaintiffs have a standalone Takings Clause claim.

## **THIRD CAUSE OF ACTION**

### *42 U.S.C. § 1983 – Procedural Due Process Claim Under Fourteenth Amendment*

(All Plaintiffs against the City)

185.  Plaintiffs hereby re-allege and incorporate the preceding paragraphs by reference.

186. The City has a policy and practice of violating property-owners' procedural constitutional rights under the Due Process Clause of the Fourteenth Amendment by failing to provide neighbors with either notice that a shed will be erected on their property or an opportunity to be heard related to the shed being erected on their property.

187.  Plaintiffs have been deprived of that interest by the City's laws and rules requiring the construction of a shed on their respective properties.

188.  Plaintiffs have been deprived of that interest without due process. Specifically, the City requires a taking of Plaintiffs' property without requiring advance warning and without a condemnation hearing or other hearing in advance of the taking occurring.

189.  On information and belief, this practice is common. Many property-owners only learn that a shed is being erected or maintained on their property when the scaffolding company arrives to construct the shed. Moreover, on information and belief, many at-risk property-owners strategically refrain from providing advance notice to their neighbors before erecting a shed— precisely to ambush them by having the shed appear suddenly to prevent property-owners from raising objections or exploring legal options. The City's laws and rules permit these practices even though they affect the property interests of Plaintiffs and members of the proposed class.

190. Every year (or at other intermittent intervals), the City engages in the separate act of issuing a new permit for a shed to be built or remain on each Plaintiff's property. Each authorization to erect or maintain a shed without notice or opportunity to be heard is a new, independent Due Process violation for that period of time (or any portion thereof). In the alternative, the fact that the shed persists in the same location without notice or opportunity to be heard is an ongoing violation of the rights of Plaintiffs and the members of the putative class, giving rise a continuing violation.

## FOURTH CAUSE OF ACTION

### *New York State Constitution, Article I, Section 7*

(All Plaintiffs against the City)

191. Plaintiffs hereby re-allege and incorporate the preceding paragraphs by reference.

192. For the reasons mentioned above (including in the First Cause of Action), the City is violating the New York State Constitution by requiring private parties to place sheds in contact with private buildings owned by others and inside the property lines of other property-owners. The City is also violating the New York State Constitution by itself building sheds inside the property lines of other property-owners and in contact with private buildings owned by others.

193. This custom and practice affected each of the Plaintiffs and members of the proposed class.

194. The Court has supplemental jurisdiction to hear these claims. This claim arises from a common nucleus of operative facts as the federal claims.

## JURY DEMAND

195. Plaintiffs demand a jury trial on damages, but not on liability.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

1. Certify this matter as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or 23(b)(3) (for the First, Second, Third, and Fourth Causes of Action).

2. Certify this matter as a class action pursuant to Federal Rule of Civil Procedure 23(c)(4) if needed.

3. Award just compensation to Plaintiffs and members of the proposed class.

4. Award pre-judgment and post-judgment interest to Plaintiffs and members of the proposed class.

5. Order all appropriate preliminary and permanent injunctive relief under federal and New York law as warranted unless compensation is paid for past or continuing violations, including but not limited to requiring the City to remove sheds from Plaintiffs' property and that of members of the proposed class, at the City's expense.

6. Certify an injunction-class and issue an injunction regarding erecting sheds on property that a party does not own without compensating property-owners for the taking.

7. Declare that (i) the City has a policy and practice of taking property (under the the U.S. Constitution, the New York State Constitution, or both) through FISP and the City Building Code and accompanying rules; (ii) the City will be liable for damages to Plaintiffs and the Class if, in the future, a neighboring property's owner places a shed in contact with or as a crossover upon a neighboring property as a result of the City's policy and practice that mandates and/or authorizes such placement of a shed; and (iii) the City will be liable if it requires property-owners to place sheds on and/or against a neighbor's property without providing notice and an opportunity to be heard.

8. Award disbursements, costs, and attorney's fees pursuant to 42 U.S.C. § 1988 and/or Federal Rule of Civil Procedure 23(h) and/or provisions of New York State law permitting the award of disbursements, costs, and attorney's fees (or other applicable provisions of federal or state law); and

9. Grant such other and further relief that may be just and proper.

Dated:      March 27, 2025               Respectfully submitted,

By:  /s/ *Hamish P.M. Hume*
Hamish P.M. Hume
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: (202) 237-2727
Email: hhume@BSFLLP.com

Robert J. Dwyer
Jared Lin (*motion for admission forthcoming*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
20th Floor
New York, NY 10001
Tel: (212) 446-2300
Email: rdwyer@BSFLLP.com
Email: jlin@BSFLLP.com

Noah A. Messing
MESSING & SPECTOR LLP
250 Park Avenue
7th Floor
New York, NY 10177
Tel: (212) 960-3720
Email: nm@messingspector.com

Phillip M. Spector (*motion for pro hac vice forthcoming*)
MESSING & SPECTOR LLP
145 West Ostend Street
Suite 600
Baltimore, MD 21230
Tel: (202) 277-8173
Email: ps@messingspector.com